**TEXAS CO. v. MONTGOMERY, Commissioner of Wild Life and Fisheries, et al.**

Civil Action No. 457.

District Court, E. D. Louisiana, Baton Rouge Division.

Aug. 29, 1947.

Judgment Affirmed Nov. 24, 1947.

See 68 S.Ct. 209.

528

Charles H. Blish, Wiley G. Lastrapes, R. C. Milling, and L. K. Benson, all of New Orleans, La., for plaintiff Texas Co.

Fred S. LeBlanc, Atty. Gen., Robert R. Reid, 2d Asst. Atty. Gen., and Francis R. Edwards, John L. Madden, and Robert G. Chandler, Sp. Asst. Attys. Gen., for Luther S. Montgomery and other defendants.

Before LEE, Circuit Judge, and DAWKINS and PORTERIE, District Judges.

LEE, Circuit Judge.

This is a bill in equity brought by the Texas Company to have Act No.367 of 1940,

as amended by Act No.199 of 1942, creating the Louisiana Stream Control Commission, with control of waste disposal into lakes, streams, rivers, and coastal waters of the State of Louisiana, declared null and void as violative of the Fourteenth Amendment of the federal Constitution and of certain articles of the State Constitution, or, in the alternative, to have an alleged order of the Commission, dated June 30, 1947, issued pursuant to the act, declared null and void for similar reasons. The matter is before us on an application for a preliminary injunction. The defendants, the personnel of the Commission, moved to dismiss the bill on the ground that plaintiff must avail itself of the administrative machinery set up under the act before resorting to the courts; then, reserving all rights under the motion, they answered denying the material allegations of the complaint. By agreement the motion and the application for injunction were submitted together upon the pleadings and a stipulation of facts.

The facts pertinent to the issues briefly are as follows: The Texas Company is now, and for a number of years has been, engaged in drilling for, producing, handling, and marketing petroleum and petroleum products in the State of Louisiana. The magnitude of its operations in the State is indicated by the fact that in 1946 it paid to the State of Louisiana $2,800,000 in severance taxes, and spent in the State $940,000 in acquiring leases, $14,000,000 in drilling operations, and $6,700,000 in rentals and royalties. Its operations are carried on in forty-three fields in Louisiana, six fields located in the northern parishes of the State and thirty-seven fields in the southern or coastal area of the State.

In the coastal area, oil and gas are usually found in the earth in intimate contact with salt water, and the salt water is produced along with oil and gas. At the surface, the salt water is separated from the oil by mechanical devices. From wells in the coastal area located in or near elevated dry lands, it is impounded in disposal wells or run into evaporation pits; from wells located in low marsh lands it is run into canals and bayous; and from wells located in water areas it is loosed into the open waters. All, or practically all, of the operating companies in the coastal area follow this procedure. On April 30, 1941, the Commission adopted certain general rules governing disposal of oil well wastes; on May 27, 1941, the rules were published in one issue of a daily newspaper, the official journal of the State and of the Parish of East Baton Rouge. Paragraph 5 of the rules was amended on April 19, 1943, and the amendment was published in one issue of said journal on May 15, 1943.[1] Plaintiff had no prior notice of the Commission's meetings or of the fact

[1] The pertinent parts of the rules, as amended, are as follows:

"6. No salt water shall be discharged from a lease until all oily waste has been completely separated therefrom, except in cases where the transfer of such salt water from the lease to a central treating plant has been approved in writing by the Stream Control Commisson or one of its agents. Separating pits or other equally effective device, for the separation of oily wastes from oil field brine shall be constructed and operated in such a manner that no oily waste will be carried from the lease, except to central treating plants, and shall meet any reasonable minimum requirements set up in any particular field or lease by the Stream Control Commission. In oil field brines discharged to streams the oil content shall not exceed 30 p.p.m.

"7. No oil field brine shall be discharged into any stream, lake or other body of water, or into any ditch or surface drainage leading to any stream, lake, or other body of water, when it is determined by the Stream Control Commission that such discharge would adversely affect the palatability of a source of potable water to an appreciable degree, or would be deleterious to the public health, or to the prosecution of any industry or lawful occupation for which or in which any such waters may be lawfully used or employed, or whereby the carrying on of any agricultural pursuit may be injuriously affected or whereby the lawful conduct of any livestock industry or the use of any such waters for domestic animals may be prevented, injuriously affected or impaired, or whereby any lawful use of any such waters by the State of Louisiana, or by any political subdivision, or by any corporation, association, partnership, or person, or any other legal entity may be lessened or impaired, or materially interfered with, or whereby any fish life, or

that rules governing disposal of oil field waste would be considered at the meetings. On September 23, 1946, the Commission considered a complaint "regarding pollution, said to cause oyster mortality in the Grand Bay Field." At that meeting the Commission by formal resolution instructed that a copy of the rules governing disposal of oil field waste be mailed to each of the companies operating in the coastal area. Thereupon a copy of the rules was mailed to each of the companies on the Commission's mailing list, including the plaintiff, and the request was made that the rules be complied with by each of them. Plaintiff, in due course, acknowledged receipt. On November 20 and 26, the Commission met to consider a petition to prohibit the discharge of oil well brine into coastal waters, and by formal resolution ordered the oil companies operating in sixteen parishes in the coastal area to cease the discharge of oil well brine and other waste into the inland waters of those parishes and into their coastal waters within the three-mile limit. A copy of this resolution was mailed to plaintiff and to the other operating companies on the Commission's mailing list. Thereafter, in December 1946 and during the first six months of 1947, the Commission at various meetings considered the deleterious effects of oil and oil well brine, or bleed waters,[2] on oysters, shrimp, and other fish life. These meetings culminated in notices of determination, under section 9 of the act, being served on or about June 30, 1947, on plaintiff and on several, but not all, of the companies discharging oil well waste into the coastal and nearby waters. In the notices, attention was directed to several apparent infractions of the Commission's rules and regulations, including the discharge of salt or bleed waters into the open waters of certain bays,[3] and all companies so notified were requested to file with the Commission, within ten days, a report of the preventive measures, if any, being taken to control the resulting pollution.[4] No opportunity was afforded the plaintiff or the other companies to attend these various meetings, nor were the proceedings of the meetings published. Prior to the issuance and service of these notices of determination, oyster growers, in coastal waters into which

---

any beneficial animal or vegetable life in said waters may be destroyed, or the growth or propagation thereof prevented or injuriously affected; provided that oil-free brine may be discharged under maximum dilution ratios prescribed for any particular stream or field by the Stream Control Commission, or during any particular period in which such discharge is determined by the Commission to be free from pollution hazard, or necessary in the public interest.

"8. Wherever possible, disposition of oil field brine shall be accomplished by discharge through disposal wells to underground horizons below the fresh water level, such wells to be so drilled, cased, cemented, equipped, and operated that no fresh water horizon shall be polluted; provided that this rule shall not apply in fields or areas where it is determined by the Stream Control Commission that disposition of the brine is or may be accomplished by discharge into water bodies normally or seasonably sufficiently saline to preclude any actual or potential pollution hazard due to such discharge."

[2] Defined by the Supreme Court . of Louisiana in Doucet v. Texas Co. et al., 205 La. 312, 17 So.2d 340, 342, as "a substratal water of high salt content

through its proximity to underlying salt domes that is separated from the oil upon its arrival at the surface and discarded, referred to scientifically as oil well brines."

[3] The discharge of salt water or oil field brine into the open waters of certain bays is the only violation involved in this suit.

[4] The pertinent parts of the notice served on plaintiff follow:

Stream Control Commission .
Baton Rouge, Louisiana
June 30, 1947
Notice of Determination

To: Texas Company
Charles H. Blish, Agent for Service
New Orleans, Louisiana

You are hereby ·notified in accordance with the provisions of Section 9 of Act 367 of 1940, as amended by Act 199 of 1942, that the Stream Control Commission at a meeting of said Commission held in Baton Rouge, Louisiana, at its offices, June 17, 1947, upon complaints made to said Commission, has determined that the operations of the Texas Company are in violation of the provisions of "Rules Governing Disposal of Oil Field Wastes," adopted by the Stream Control Commission and as amended April 19, 1943; and of the

oil well brine or bleed waters were discharged, filed numerous suits, in State and federal courts, against the plaintiff and other operating oil companies for damages to oyster life allegedly due to the discharge into the open waters in the coastal area of oil field waste and brine. The damages alleged in these suits, now pending, aggregate several million dollars.

After receipt of the notice of determination dated June 30, 1947, plaintiff filed this action seeking injunctive relief.

The pertinent sections of the act, as amended, are set forth in a footnote.[5]  No provisions of Act 367 of 1940, as amended by Act 199 of 1942.

The specific violations referred to above are as follows:

| Oil Field | Nature of Violation | Date of Violation |
|---|---|---|
| West Barataria | No impervious decks or gutters Bleed water overboard (Rules 4 & 7) | May 22, 1947. |
|  | * * * * * * * * |  |
| Golden Meadow | * * * * . * * * * Falgout No. A. Battery. Bleed water from battery through wooden trough to skimming pit, finally into canal (Rules 6 & 7). |  |
|  | * * * * * * * * |  |
| Lake Salvador | No impervious decks and gutters. (Rule 4). Bleed water overboard (Rules 6 & 7). | June 4, 1947. |
|  | * * * * * * * * |  |

You are required within ten days from receipt of this notice of determination, to file with the Commission a full report, showing what steps have been taken and are being taken to cause cessation of the violation aforesaid and to control the condition complained of.

Attest:  By Order of the Stream Control Commission of Lou isiana

/s/ Major James Brown
Secretary  Chairman
/s/ Joyce W. Ceumbolt

The above and foregoing notice of determination served upon Charles H. Blish, agent for The Texas Company, June 30, 1947.

Frank J. Coogan

[5] "Section 3. That the Stream Control Commission shall have control of waste disposal, either public or private, by municipalities, industries, public or private corporations, individuals, partnerships, associations or any other entity into any of the lakes, rivers and streams of the state or any tributaries or drains flowing into any of such lakes, rivers or streams and into any of the coastal waters of the Gulf of Mexico within the territorial jurisdiction of the State of Louisiana, for the prevention of pollution thereof tending to destroy fish life, or to be injurious to the public health or the public welfare or to other aquatic life or wild or domestic animals or fowls.

"The Commission shall have authority to make and promulgate such rules and regulations and to conduct such investigations as it, from time to time, may deem necessary to carry out the provisions of this Act.

"Rules, regulations, determinations and orders of the Commission shall be promulgated by publication in one issue of a newspaper designated as the official journal of the parish or parishes affected and in one issue of the newspaper designated as the official journal of the State of Louisiana; provided that, in the discretion of the Commission, any such promulgation by publication may be confined to publication in one issue of the official journal of the State of Louisiana, and actual notice to parties affected, or, in cases where such rules, regulations, determinations and orders are applicable and of interest only to the parties affected, to such actual notice without publication.

"Section 4. That the Commission shall be authorized to bring any appropriate action in court in the name of the State of Louisiana that may appear to it to be necessary to carry out the provisions of this Act.

"Section 7. That the Commission shall establish such pollution standards for lakes, rivers, streams, and other waters of the State in relation to the public use to which they are or may be put as it shall deem necessary. It shall have the authority to ascertain and determine for record and in making its order what volume of water actually flows in all streams, and the high and low water marks of rivers, streams and other waters of the State, affected by the waste disposal or pollution of mu-

State appellate court has interpreted the act, and each of the questions raised must of necessity be passed on by us as of first impression.

---

nicipalities, industries, public and private corporations, individuals, partnerships, associations, or any other entity. It shall have the authority by order and regulation ˙to regulate, control or restrain the discharge of any waste material or polluting substance discharged or sought to be discharged into any river, stream, lake or other waters of the State. It shall have authority to prohibit any discharge resulting in pollution which is unreasonable and against the public interest in view of the existing conditions in the rivers, streams, lakes or other waters of the State.

"Section 8. That it shall be unlawful for any person to discharge or permit to be discharged into any of the rivers, streams, lakes or other waters of the State any waste or any pollution of any kind that will tend to destroy fish or other aquatic life or wild or domestic animals or fowls or be injurious to the public health or against the public welfare in violation of any rule, order or regulation of the Commission, and any person so discharging any such waste or pollution into any of the waters of this State shall be deemed guilty of a violation of the provisions of this Act.

"Section 9. That whenever in the opinion of the Commission any person shall violate or is about to violate the provisions of this Act, or fails to control the polluting content or waste discharged or to be discharged into any waters of the State, the Commission or any representative thereof may notify the alleged offender of such determination of the Commission. Such notice may be served by any officer empowered to serve process under existing laws or by any officers or agent of the Commission. Within ten days from the receipt of notice of the determination, such person shall file with the Commission a full report, showing what steps have been taken and are being taken to control such waste or pollution. Thereupon the Commission may make such orders as in its opinion is deemed necessary.

"In an emergency causing or likely to cause irreparable damage, or if the public interest requires, the Commission may issue a temporary order requiring that such waste disposal and such waste discharge or pollution be stopped and terminated pending a hearing provided that such temporary order shall not be effective for more than five (5) days beyond the date of hearing and in no event for more than twenty (20) days.

"Section 10. That whenever any person shall feel himself aggrieved by the restrictions of the polluting content or waste, or pollution, or any other order of the Commission, he shall have a right to file a sworn petition with the Commission, setting forth the grounds and reasons for his complaint and asking for a hearing of the matter involved. The Commission shall thereupon fix the time and place for such hearing and shall notify the petitioner thereof. At such hearing the petitioners and any other interested party may appear, present witnesses and submit evidence. Following such hearing, the final order of determination of the Commission upon such matters shall be conclusive; provided, that such order may be reviewed de novo in the district court in and for the Parish of East Baton Rouge, State of Louisiana, which said parish is declared to be the domicile of the said Commission, upon petition therefor filed within ten (10) days after the final order of determination issued by the Commission, and on such review the decree of the court shall take the place of the order of the Commission.

"Section 11. That after service of a written notice of determination, setting forth specifically any violation of this Act, any person who shall fail to make the report required in Section 9 of this Act and who is thereafter found to be continuing such violation shall be prosecuted under this Act provided, however, that pending the hearing provided for in Section 10 of this Act no criminal charges shall be filed until the termination thereof.

"Section 12. That any person found guilty of violating any of the provisions of this Act, or any written order of the Commission in pursuance thereof, shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not less than Twenty-five ($25.00) Dollars and not more than One Thousand ($1,000.00) Dollars, and costs of prosecution, or by imprisonment in the parish jail not to exceed one year or both such fine and imprisonment in the discretion of the court. Each day upon which a violation of the provisions of this Act occur shall be deemed a separate and additional violation for the purpose of this Act. The Attorney General of the State of Louisiana shall have charge of and shall prosecute all cases arising out of violation of the provisions of this Act including the recovery of penalties."

In approaching the questions before us it is well to bear in mind (1) that the federal courts are loath to interfere with the enforcement of a rule, regulation, or order of a State board or commission where the State statute under which the State authorities act affords administrative relief;[6] and (2) that while federal courts will act under certain circumstances to prevent an invasion of the constitutional rights by State authorities, although no prior attempt has been made to exhaust administrative remedies, as a general rule they will do so only where the State statute is void upon its face.[7] All parties to the litigation admit these governing principles, but they are far apart in their construction of the act and in their application of these principles thereto.

Plaintiff contends that the act, on its face, is unconstitutional, that it is violative of the Fourteenth Amendment and of the State Constitution:

Of the Fourteenth Amendment for the reasons that

(a) The statute confers upon the Commission uncontrolled and unlimited power with reference to pollution and the power to discriminate unjustly as between persons or areas to be affected by its rules and orders.

(b) It does not afford to parties affected adversely, as is plaintiff, due notice or adequate hearing.

(c) The penalties are excessive, and the administrative review set up in the act is incompetent in that the penalties of the act accrue regardless of the hearing and judicial review set out in the act.

Of the Louisiana Constitution for the reasons that

(a) It delegates to the Commission legislative powers.

(b) It purports to confer upon the Commission the power to adopt a system or code of laws.

(c) It delegates to the Commission the power to make or adopt local or special laws.

(d) It vests in the Commission powers to regulate and control mineral operations, which, under the Constitution, is vested in the Department of Conservation, and to regulate and control wild life, oysters, fish, and other aquatic life, which, under the provisions of the Constitution, are vested in the Department of Wild Life and Fisheries.

(e) It vests the Commission with power to institute suits in the name of the State of Louisiana, which, under the State Constitution, is vested only in the Governor and Attorney General.

(f) It illegally attempts to delegate to the Commission powers in matters of public health, vested under the Constitution in State, parish, and municipal boards of health.

The plaintiff further contends that, notwithstanding the unconstitutionality of the act, defendants have promulgated rules and regulations and issued orders pursuant thereto that will seriously affect its business. Defendants answering contend that the act is valid, that the administrative remedies amply protect the rights of those whose interests are affected, and that no constitutional right of the plaintiff is being invaded or threatened. At the threshold, therefore, we must construe the statute and then determine the question of its constitutionality.

The object of the act is to prevent the harmful pollution of the waters of the State and the coastal waters of the Gulf of Mexico within the territorial jurisdiction of the State, and, to that end, to regulate and control public and private waste disposal into any of such waters. To accomplish this purpose the Commission was created. Plaintiff argues that there is no plan or standard fixed in the act for the Commission's guidance and that the Commission is vested with discretion to approve or condemn as it sees fit. The obvious answer is that it would have been impossible for the Legislature to prescribe a formula for the Commission's guidance or to lay down rules with reference to harmful pollution, applicable to all waters: What might

---

6 28 Am.Jur. § 266, p. 440.

7 42 Am.Jur. § 200, p. 587; Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Smith v. Cahoon, 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264.

be harmful pollution in one body of water might not be harmful pollution in another. Of necessity, a determination of the facts of what might constitute harmful pollution was left to a fact-finding group. The Legislature was compelled to create an agency to administer the act.

Contrary to plaintiff's contention, the authority to prohibit pollution was not unlimited. The act provides (section 7) that in establishing pollution standards the Commission shall have authority to ascertain and determine what volume of water actually flows in the streams, and the high and low watermarks of the rivers, streams, and other waters of the State affected by waste disposal; to regulate, control, and restrain by rules and orders the discharge of any waste material entering a body of water; and to *prohibit* any discharge resulting in pollution which is unreasonable and against the public interest in view of existing conditions. Specifically, under the act, the Commission may prohibit only such discharge as will result in pollution which is unreasonable and against the public interest in view of the existing water conditions. A standard or pattern by which it may act is thus set up, that is, pollution which is unreasonable and against public interest. It is clear that the statute contemplates that the rules, regulations, and orders of the Commission shall be reasonable and fair; thus, impliedly it forbids arbitrary action by the Commission.

To safeguard the rights of the public, the act affords a hearing to those who are affected. If in the opinion of the Commission any person violates or is about to violate a provision of the act, the Commission may serve notice on him of such determination, and he has ten days after receipt of the notice to file with the Commission a full report showing what steps have been or are being taken to control such pollution. Then only may the Commission make such order as it may deem necessary. If the alleged offender feels himself aggrieved, he has the right to file a petition with the Commission, setting forth the reasons for his complaint and asking for a hearing on the matter involved. Whereupon, the Commission must fix a time and place for a hearing and notify him. At the hearing the petitioner and any other interested party may appear, present witnesses, and submit evidence. After the hearing, a formal order of determination is entered, and that order is conclusive except that it may be reviewed de novo in the District Court for the Parish of East Baton Rouge upon a petition filed therein within ten days. On such a review, the decree of the court supersedes the order of the Commission.

It is true that section 8 makes it unlawful for any person to discharge or permit to be discharged in State waters any pollution that would tend to destroy fish or other aquatic life, or which may prove injurious to wild or domestic animals, or to the public health or welfare, in violation of a rule, order, or regulation of the Commission; and that, under section 12, any person found guilty of violating any provision of the act or any written order of the Commission shall be deemed guilty of a misdemeanor, and upon conviction fined not less than $25 or more than $1,000, and costs, or be imprisoned in the parish jail for a period not to exceed one year, or both, within the discretion of the court, and each day's violation of the act is made a separate offense for the purpose of the act; but the provisions of sections 8 and 12 must be read in the light of sections 7, 9, and 10, and, when so read, it is clear that the authority of the Commission to regulate, control, and restrain the discharge of waste material which will result in the pollution of the waters of the State is circumscribed and limited to pollution which is unreasonable and against public interest in view of the existing condition of the waters. A determination by the Commission, under section 9, that a person is violating the provisions of the act and is proceeding contrary to the rules, regulations, or orders of the Commission by discharging waste materials which will result in polluting State waters unreasonably and against public interest is not final but is subject to such findings as may be made following hearings, at which the aggrieved person may present witnesses and submit evidence, first before the Commission and then de novo before the State court, where

the final order is made. All these provisions circumscribe the compass within which the Commission may act, and assure to an aggrieved person a fair and impartial hearing.

To hold that the hearings under the act are limited in scope to a determination of whether the rules and orders of the Commission pertaining to pollution are being violated, without the right to question whether under its rules and orders "pollution," within the compass of the act, is taking place, in effect would mean holding that the Commission could arbitrarily determine that any discharge of waste material, no matter how infinitesimal, into any body of water, however large, would result in pollution. Since the act seeks to control unreasonable pollution which is against the public interest, the hearings provided necessarily relate to a determination of the existence and extent of pollution; otherwise, the Commission, if so disposed, could overstep or thwart the declared purpose of the act.

■ The mere fact that certain operators discharging oil well brine into the waters of the coastal area, were not served with orders to desist or with notices of determination under section 9, is not proof that plaintiff and other operators so served are being unfairly or arbitrarily dealt with. Water conditions at or near the point of discharge by those served may be wholly different from conditions at the point of discharge of those not served. For instance, oyster reefs or beds where oyster life may be adversely affected may be near the one and not the other. Pollution may result from one and may not result from the other.

■ " 'The modern tendency is to be more liberal in permitting grants of discretion to administrative bodies or officers in order to facilitate the administration of laws as the complexity of economic and governmental conditions increases.' 11 Amer.Jur. Section 234, page 949. 'The policy of the law favors the placing of detailed responsibility in administrative officers. The courts uphold statutes vesting such power in such officers if it is possible fairly to do so, at least where the powers are merely ministerial.' Ibid., Section 240, page 955."

National Bank of Commerce v. Board of Supervisors, 206 La. 913, 20 So.2d.264, 270.

The provision in section 11 that any person who fails to make the report required in section 9, after service of written notice of determination, and who is thereafter found to be continuing such violation, shall be prosecuted under the act, clearly has to do with those cases where the person so notified makes no report and does not apply for the administrative relief provided for in section 10 and who is thereafter found guilty of violating the act. The provision in section 11 that, pending the hearing provided in section 10, no criminal charges may be filed until the termination thereof would indicate that where a hearing was requested it was the final order following the hearing that would determine whether the act was being violated, hence, no criminal charges would be preferred pending the hearing. Clearly, it is violation following determination under section 9 when no hearing is requested, or under section 10 when a hearing is requested that would subject the violator to the penalties of the act.

■ There is some merit perhaps to the contention that the act violates the State Constitution in that it vests power in the Commission to declare what conduct shall constitute a misdemeanor, a power which can be exercised only by the Legislature. Crimes in Louisiana are purely statutory. State v. Maitrejean, 193 La. 824, 192 So. 361. Louisiana courts have been consistent in holding that the power to determine what conduct constitutes a crime is an exclusively legislative function which cannot be delegated to a legislatively created agency. State v. Gaster, 45 La.Ann. 636, 12 So. 739; State v. Billot, 154 La. 402, 97 So. 589; State v. Snyder, 131 La. 145, 59 So.44; State v. Watkins, 176 La. 837, 147 So. 8; State v. Maitrejean, supra. The Louisiana view is contrary to that taken by the Supreme Court of the United States. In that Court, the right of Congress to provide criminal redress for violations of regulations through officers of administrative bodies to which Congress has delegated certain powers has been repeatedly upheld.

536

In re Kollock, 165 U.S. 526, 17 S.Ct. 444, 41 L.Ed. 813; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; United States v. Grimaud et al., 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563. It is not necessary, however, for us to pass upon this question, as no criminal action under the act is before us, nor does the record indicate that such action is presently contemplated. An unconstitutional provision of the act does not operate to condemn the act in its entirety.

A reading of the act discloses that it does not confer upon the Commission the power to adopt a system or code of laws or to adopt local or special laws; it does not purport to deprive, nor does it deprive, the Department of Conservation or the Commissioner of Conservation of its or his duties and powers over minerals and mineral development, or the Department of Wild Life and Fisheries or the Commissioner of Wild Life and Fisheries of its or his duties and powers over wild life, oysters, fish, and other aquatic life. It reserves to the various boards of health, State and local, control over matters relating to the public health. Under sections 4 and 12, while the Commission may institute actions in the name of the State of Louisiana to carry out the provisions of the act, it must do so through the Attorney General of the State.

As previously stated, this suit was filed after a notice of determination was served upon the plaintiff (see footnote No. 4). Under section 9, this was only a preliminary step looking to the determination of whether or not the discharge of oil well brine in certain coastal waters of the State named in the notice results in unreasonable pollution of those waters. The right to be heard in determining this question is given to the plaintiff in section 10. The act stands regardless of its penal provisions, for the act itself provides that should any section or provision be held to be invalid by any court of competent jurisdiction such shall not affect the other provisions of the act.

On the issues before us, the act meets the test of due process of the Fourteenth Amendment and does not conflict with the prohibitions of those articles of the State Constitution cited by petitioner. The constitutional nullities pleaded are, we think, without merit.

Until a final order of determination by the State court on review of a final order by the Commission has been issued adversely affecting plaintiff's rights, its application to this court for an injunction is premature. The application for a preliminary injunction, therefore, is denied, and the plaintiff under its alternative prayer is given a period of ten days, dating from the signing of the decree herein, to file a reply, as provided in section 9 of the statute, to the notice of determination, and to take such other steps and to perform such other acts and things as said act, as amended, permits it to take and to perform.

Subject to the alternate relief thus granted, the motion to dismiss is sustained without prejudice. Proper decree may be presented.

PORTERIE and DAWKINS, District Judges, concur.